UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EGI-VSR, LLC,

                       Petitioner,

         – against –

RICHARD LESLIE HUBER, ALEXANDER
LESLIE HUBER, CATREX LIMITADA, and
DICREX LIMITADA,

                   Respondents.

**OPINION & ORDER**
19 Civ. 6099 (ER)

Ramos, D.J.:

      This case concerns a foreign arbitral award entered in favor of EGI-VSR, LLC ("EGI"). On June 28, 2019, EGI petitioned this Court to recognize and enforce that award pursuant to the Inter-American Convention on International Commercial Arbitration of January 30, 1975 (the "Panama Convention") as incorporated by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 300 *et seq*. The respondents—Richard Leslie Huber ("Richard"), Alexander Leslie Huber ("Alex"), Catrex Limitada ("Catrex"), and Dicrex Limitada ("Dicrex," and collectively the "Hubers")— have moved to dismiss the petition, arguing (1) that the Court lacks personal jurisdiction over three of the respondents, (2) that the award is unenforceable under specific provisions of the Panama Convention, and (3) that the petition is time-barred. Although the Court disagrees with the Hubers' first and second positions, it finds that the petition is time-barred and, accordingly, GRANTS the motion to dismiss.

## I.     BACKGROUND

      In 1999, Juan and Jorge Coderch, two Chilean businessmen, secured an investment from Richard Huber, a New York resident, to help kickstart Viña San Rafael ("VSR"), a boutique

Chilean winery.  Resp'ts' Mem. Supp. Mot. Dismiss 4–5, Doc. 14 (hereinafter "Resp'ts' Mem. MD").  In 2001, Alex Huber—Richard's son and a U.S. citizen living in Chile—joined VSR, where he served as CFO and helped to raise capital for the company.  *Id.* at 5; Alexander L. Huber Decl. ¶¶ 10–13, Doc. 17 (hereinafter "A.H. Decl.").  In 2002, while VSR was still relatively young, Richard became familiar with Sam Zell, the founder of EGI—a limited liability company incorporated in Delaware with a principal place of business in Chicago, Illinois.  After learning of VSR, Zell purportedly asked Richard about investing in the company.  Pet. to Recognize and Enforce Foreign Arbitral Award ¶ 1, 5, Doc. 1 (hereinafter "Pet.").  Although the Hubers claim to have played no role in negotiating EGI's eventual investment, Richard did introduce Zell to Juan Coderch, the two of whom negotiated over several months in 2005.  *Id.* ¶ 5.

On October 19, 2005, EGI purchased 4,240,000 preferred shares of VSR's stock, making it a minority shareholder of VSR.  *Id.* ¶ 11.  Over time, EGI purchased a total of 7,544,449 shares of VSR, representing an investment of approximately $17 million.  Alex and Richard, on the other hand, claim that they collectively owned less than 18% of VSR's total common shares, never held more than one seat on the Board of Directors, and never had any control over Board or management decisions.  Resp'ts' Mem. MD 5–6.  In 2008, Alex and Richard transferred ownership of their shares to Catrex and Dicrex, respectively, *id.* at 5, both of which are limited liability partnerships formed under Chilean law for the sole purpose of holding the Hubers' shares in VSR, *id.* at 4, 17.

As a part of its initial investment, EGI requested that all of VSR's shareholders enter an agreement to protect EGI's interests by, *inter alia*, creating a Put Right exercisable by EGI in the

event that VSR's Controlling Shareholders breached specific provisions of the agreement.[1]  Vail. Decl. Supp. Petition I, Ex. E ¶ 10, Doc. 4 (hereinafter the "Shareholders' Agreement").  Once exercised, the Put Right required the Controlling Shareholders to "purchase all of [EGI's] shares at a price equivalent to 103% of the preferred liquidation price within a set deadline."  Pet. 4 (citing Shareholders' Agreement ¶ 10).  In addition to the Put Right, the Shareholders' Agreement provided that "[a]ny difficulty or controversy arising among the parties with respect to [the Agreement] shall be submitted to Arbitration," which was to be held in Chile.  ¶ 23.

By early 2008, the Hubers were concerned that VSR was losing money and underutilizing its assets, and in August 2008, after they allegedly attempted to rectify those issues to no avail, Alex was, according to the Hubers, ousted from the company.  Resp'ts' Mem. MD  6; R.H. Decl. ¶¶ 26–28; A.H. Decl. ¶¶ 28–30.  More than a year later, on September 2, 2009, EGI expressed in a letter to the Controlling Shareholders that it believed certain activities had violated the Shareholders' Agreement in a manner that triggered the Put Right.  Resp'ts' Mem. MD  6–7.  On October 13, 2009, EGI sent another letter to the Controlling Shareholders, this time officially exercising the Put Right and invoking the Agreement's arbitration clause.  On November 27, 2009, the parties submitted their dispute to arbitration.  Pet. ¶¶ 14–15.

The Hubers claim that, although they were "nominally" named as respondents in the arbitration, "EGI never alleged that they engaged in wrongdoing" and, as the Hubers understood from EGI's conduct and conversations, "EGI saw the Hubers as allies and had no intention of enforcing the Put Right against them."  Resp'ts' Mem. MD 7; *accord.* R.H. Decl. ¶¶ 35–36, 50.

---

[1] The Shareholders' Agreement explicitly defines "Controlling Shareholders" as certain listed individuals and corporations, including Richard and Alex Huber.  Contrary to the Hubers' characterization of the term, Resp'ts' Mem. MD  5–6; Richard L. Huber Decl. ¶¶ 17, 21–25, Doc. 16 (hereinafter "R.H. Decl."); A.H. Decl. ¶¶ 19, 22–27, whether an individual or corporation was a controlling shareholder in the ordinary sense had no bearing on whether they were a "Controlling Shareholder" bound by the Put Right.

Supposedly relying on their understanding of EGI's conduct, the Hubers refrained from

mounting any affirmative defense during arbitration and allegedly assisted EGI in making its

claims against Juan and Jorge Coderch, to whom the Hubers attribute fault for the misconduct

leading to the arbitration.  Resp'ts' Mem. MD 7–8; R.H. Decl. ¶¶ 37–38.  Moreover, they claim

that EGI made "repeated assurances that [they] would never seek to collect from the Hubers" or

"betray their trust in supporting EGI's efforts to win the arbitration against the Coderches."

Resp'ts' Mem. MD 8, 10; *accord.* R.H. Decl. ¶¶ 41–51.

EGI views the events surrounding the arbitration in a different light.  First, they suggest

that while the Hubers "chose" not to present any defense at arbitration, they were neither

prevented from doing so nor lulled into abstaining.  Pet'r's Mem. Supp. Pet. & Opp'n Mot.

Dismiss 16, Doc. 20 (hereinafter "Pet'r's Mem. MD").  Second, they note that they did not

believe that the Hubers were blameless and that, during arbitration, EGI alleged the Hubers had

"induced [EGI] to invest and . . . voted to authorize the wrongful actions that triggered [EGI's]

put right."  *Id.* 17 (citing Vail. Decl. I, Ex. A at 7, 12 (hereinafter the "Award")).  Lastly, they

note that, during the proceedings, EGI submitted that they were "not an ally of the Huber

Parties" and were not engaged in any joint action or agreement therewith.  *Id* (quoting Award at

53).

In any event, the arbitrator issued a final award on January 13, 2012, which determined

that the Controlling Shareholders had violated numerous sections of the Shareholders'

Agreement.  Pet. ¶ 16.  As a result, the arbitrator ordered "each and every one of the respondents

. . . [to] buy and pay for all the shares of the claimant, [EGI], in the company [VSR] in the way

requested in the claim."  *Id.*  EGI maintains that, based on the various purchase prices and share

totals authorized by the Final Award, they are entitled to recover $28,700,450.07, an amount

equaling the total put purchase price, from any of the respondents to the arbitration, all of whom were held jointly and severally liable thereunder.  *Id.* ¶¶ 17–18, appx. A.

On January 12, 2015, EGI initiated enforcement proceedings against Juan Coderch in the Southern District of Florida.  *Id.* ¶ 18.  On June 4, 2018, that Court issued an opinion recognizing the award and requiring Coderch to pay the aforementioned put purchase price of $28,700,450.07.  *Id.*  At this time, Coderch has not satisfied any portion of that judgment, and he has appealed the decision to the Eleventh Circuit.  *Id.*

About a month before bringing that action, EGI entered into an agreement with the Hubers that prevented EGI from enforcing the award against them, tolled "the statute of limitations and other laws, rules or treaties that might in any jurisdiction time bar or extinguish any [of EGI's claims concerning VSR], or the enforcement [thereof] or the ability to recover [thereunder]," and barred the Hubers from raising all statute of limitations-based defenses "from the date of this Agreement until the expiration of this Agreement."  Vail. Decl. I, Ex. B ¶¶ 1–2 (hereinafter the "Standstill Agreement").  Both parties were empowered to terminate the agreement after providing sufficient notice, at which point EGI could seek to enforce the award against the Hubers.  *Id.* ¶ 8.[2]  On May 7, 2019, EGI exercised that right and sent notice to the Hubers that, in thirty days from that date, the Standstill Agreement would be terminated.  Vail. Decl. I, Ex. D (hereinafter the "Termination Letter").

---

[2] The Standstill Agreement also provided that the Hubers consented to service of process in New York by mail and electronically "in connection with the Chilean arbitration proceedings and any other actions," ¶ 3, that the Agreement would be governed by New York law and that disputes arising thereunder would be resolved by a court in New York, *id.* ¶ 5, that the parties "agree[d] to work together in good faith to maximize collections on their respective [VSR claims]," *id.* ¶ 4, and that the Hubers would "play an active role" in developing a strategy for doing so, in part by providing any communications to or from Juan or Jorge Coderch or information relating to their assets, *id.*

Not long after, on June 28, 2019, EGI initiated this action, seeking to enforce the award against the Hubers pursuant to the Panama Convention and the FAA. 9 U.S.C. § 300 *et seq.* On August 16, 2019, the Hubers moved to dismiss that petition for lack of jurisdiction, untimeliness, and unenforceability under the Panama Convention. Resp'ts' Mem. MD 1–4. EGI subsequently moved to strike a portion of the second declaration submitted by the Hubers' purported "Chilean law expert," Professor Carolina Coppo Diez, *id.* at 2, which concerned the availability of joint and several liability under Chilean law, Carolina Coppo Diez Decl. II, Doc. 27 (hereinafter "Coppo Decl. II"). In the alternative, EGI requested that it be permitted to submit an additional declaration challenging that of Professor Coppo. Pet'r's Mot. Strike, Doc. 28 (hereinafter "Mot. Strike").

## II.    LEGAL STANDARDS

### A. Enforcement of Foreign Arbitral Awards

Arbitral awards are not self-enforcing and must therefore be "given force and effect by being converted to judicial orders by courts." *Power Partners MasTec, LLC v. Premier Power Renewable Energy, Inc.*, No. 14 Civ. 8420 (WHP), 2015 WL 774714, at *1 (S.D.N.Y. Feb. 20, 2015) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006)). The FAA provides for enforcement of foreign arbitral awards under both the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), 9 U.S.C. § 200 *et seq.*, and the Panama Convention, *id.* § 300 *et seq.* The FAA provisions concerning the Panama Convention explicitly incorporate many of those concerning the New York Convention, including the enforcement provision, *id.* § 302, and the precedents under one are generally applicable to the other, *Corporación Mexicana de Mantenimiento*

*Integral v. Pemex-Exploración y Producción*, 962 F. Supp. 2d 642, 653 (S.D.N.Y. 2013) (citing *Productos Mercantiles e Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 45 (2d Cir. 1994)).

      The FAA imposes a three-year statute of limitations on petitions seeking enforcement of foreign arbitral awards subject to either convention.  9 U.S.C. § 207.  Once a timely petition is made, however, it is generally handled through a summary proceeding that translates the final award into a judgment of the court.  *D.H. Blair*, 462 F.3d at 110; *Gomez de Hernandez v. Wells Fargo Advisors, LLC*, No. 16 Civ. 9922 (LGS), 2017 WL 3088396, at *2 (S.D.N.Y. July 20, 2017) (citing *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 132 (2d Cir. 2015)).  In this regard, the FAA and the conventions leave little to the discretion of the courts, which "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [relevant] convention," 9 U.S.C. § 207; *see also Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005).  Article V of the Panama Convention provides for seven exclusive grounds upon which courts may refuse to recognize and enforce an award, *see Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 257 F. Supp. 2d 681, 685 (S.D.N.Y. 2003), five of which are relevant here:

      (1) "the party against which the arbitral decision has been made . . . was unable, for any other reason, to present his defense," Panama Convention art. 5(1)(b);

      (2) "the decision concerns a dispute not envisaged in the agreement between the parties to submit to arbitration," and that dispute is inseparable from those that were envisaged, *id.* art. 5(1)(c);

      (3) "the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties," *id.* art. 5(1)(d);

      (4) "the decision is not yet binding on the parties or has been annulled or suspended by a competent authority of the State in which, or according to the law of which, the decision was made," *id.* art. 5(1)(e); and

      (5) "the recognition or execution of the decision would be contrary to the public policy of [the State in which it is requested]," *id.* art. 5(2)(b).

The party opposing enforcement bears the heavy burden of proving that one or more of those

exceptions apply. *See Telenor Mobile Comms. AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir.

2009) (citing *Encyclopaedia Universalis*, 403 F.3d at 90).

  **B. Motion to Dismiss**

   In addition to the exceptions provided for in the Panama Convention, two grounds for

dismissal are relevant here.  First, the Hubers' motion to dismiss for lack of personal jurisdiction,

although not explicitly made under any specific rule or statute, is analyzed under Federal Rule of

Civil Procedure 12(b)(2).  *See Esso Expl. & Prod. v. Nigerian Nat'l Petroleum Corp.*, 397 F.

Supp. 3d 323, 332 (S.D.N.Y. 2019).  In this context, the petitioner has the burden of establishing

personal jurisdiction over the respondents and "must make a prima facie showing that

jurisdiction exists."  *Id.* (quoting *Eades v. Kennedy PC Law Offices*, 799 F.3d 161, 167–68 (2d.

Cir 2015)); *accord. Freeplay Music, LLC v. Rigol Techs. USA, Inc.*, No. 18 Civ. 10980 (ER),

2020 WL 564232, at *2 (S.D.N.Y. Feb. 4, 2020).  The Court construes the pleadings and

affidavits in the light most favorable to the petitioner and resolves all doubts in their favor.  *See

Esso Expl. & Prod.*, 397 F. Supp. 3d at 332 (citing *McGraw-Hill Glob. Educ. Holdings, LLC v.

Mathrani*, 295 F. Supp. 3d 404, 409 (S.D.N.Y. 2017)); *Freeplay Music*, 2020 WL 564232, at *2.

A court may only exercise personal jurisdiction over the respondent if (1) there is proper service

of process, (2) there is a statutory basis for personal jurisdiction, and (3) the exercise of personal

jurisdiction comports with constitutional due process.  *Esso Expl. & Prod.*, 397 F. Supp. 3d at

332 (citing *Waldman v. Palestine Liberation Org.*, 853 F.3d 317, 327 (2d Cir. 2016)).

   Second, this Court treats the Hubers' motion to dismiss the petition as time-barred as a

motion to dismiss for failure to state a claim upon which relief can be granted pursuant to

Federal Rule of Civil Procedure 12(b)(6).  *La Russo v. St. George's Univ. Sch. of Med.*, 936 F.

Supp. 2d 288, 296–97 (S.D.N.Y. 2013) (citing *Adams v. Crystal City Marriot Hotel*, No. 2 Civ. 10258 (PKL), 2004 WL 744489, at *2 (S.D.N.Y. Apr. 6, 2004)).  While the Hubers do not cite to that provision, "Rule 12(b)(6) provides the most appropriate legal basis for a motion to dismiss on statute of limitations grounds because the expiration of the statute of limitations presents an affirmative defense." *Id.* at 297.

When assessing a motion to dismiss under Rule 12(b)(6), all allegations in the complaint, or for these purposes the petition, must be accepted as true, and all reasonable inferences must be drawn in favor of the petitioner. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  The Court's limited task in deciding the motion is to determine whether the petition is legally sufficient, not whether it is likely to be meritorious. *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 357 (S.D.N.Y. 2018) (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).  If the petition provides "enough facts to state a claim to relief that is plausible on its face," then it should not be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility is satisfied "when the [petitioner] pleads factual content that allows the court to draw the reasonable inference that the [respondent] is liable for the misconduct alleged," or, in this context, that the petition should be enforced. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635 (S.D.N.Y. 2018) (applying the *Twombly* and *Iqbal* standards in the arbitration enforcement context).

## III.    DISCUSSION

The Hubers contest EGI's petition on three grounds.  First, they assert that this Court lacks personal jurisdiction over Alex Huber, Dicrex, and Catrex.  Second, they maintain that the

Award is unenforceable under five provisions of the Panama Convention.[3]  Third, they argue that the petition is time-barred under the FAA's three-year statute of limitations for Panama Convention enforcement claims.  The Court is satisfied that it has personal jurisdiction over each of the respondents, and the Court is not persuaded by any of the Hubers' arguments regarding the Panama Convention exceptions.  However, the three-year statute of limitations has clearly run on the Award, which was obtained on January 13, 2012, and because the parties' private tolling agreement is unenforceable, the petition is time-barred.

### A. Jurisdiction

The Court has subject matter jurisdiction over EGI's petition pursuant to the FAA, the Panama Convention, and the federal question statute.  9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States."); 28 U.S.C. § 1331.  The parties do not dispute that venue is appropriate under the FAA and the Panama Convention.  9 U.S.C. § 204.  However, the Hubers contest personal jurisdiction over Alex, a Chilean resident, as well as Dicrex and Catrex, both of which were formed under Chilean law.  Resp'ts' Mem. MD 17.  EGI, in response, attempts to establish jurisdiction by arguing both that the Hubers have consented to this Court's jurisdiction and also that the provision of the long-arm statute concerning business transactions, New York CPLR § 302(a) (McKinney's 2008), has been satisfied.  Pet'r's Mem. MD 3–10.

---

[3] The parties do not dispute that the Panama Convention, rather than the New York Convention, governs this petition, Pet. ¶ 7; Resp'ts' Mem. MD 1, and under the standards for determining which of the two conventions apply, this Court would apply the Panama Convention,  9 U.S.C. §§ 304–305 (prioritizing the Panama Convention where the arbitral decision was made in the territory of a foreign State and a majority of parties thereto are citizens of States that have ratified the Panama Convention and are members of the Organization of American States).

*1. Consent*

Courts have long recognized that because personal jurisdiction is premised on the Due

Process rights of the parties, rather than the Article III powers of the judiciary, parties can

consent to personal jurisdiction.  *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites*

*de Guinee*, 456 U.S. 694, 702–704 (1982); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625

(2d Cir. 2016).  Forum selection clauses and similar contractual provisions are common sources

of that consent, *D.H. Blair*, 462 F.3d at 103; *Recurrent Capital Bridge Fund I, LLC v. ISR Sys.*

*and Sensors Corp.*, 875 F. Supp. 2d 297, 306 (S.D.N.Y. 2012) (citing *Nat'l Equip. Rental, Ltd. v.*

*Szukhent*, 375 U.S. 311, 315–16 (1964)), and courts have held that contractual consent to

personal jurisdiction eliminates the need for a separate Due Process analysis, *Recurrent Capital,*

875 F. Supp. 2d at 306 (S.D.N.Y. 2012) (first citing *Packer v. TDI Sys., Inc.*, 959 F. Supp. 192,

196 (S.D.N.Y. 1997); and then citing *D.H. Blair*, 462 F.3d at 103).

As EGI notes, the Standstill Agreement between the parties contains the following forum

selection clause:  "[A]ny dispute under this Agreement shall be resolved in a court of competent

jurisdiction in New York, New York."  Moreover, the Hubers agreed "to accept service of

process in connection with the Chilean arbitration proceedings and any other actions" either by

email to Richard or by certified mail sent to his New York City address.  Standstill Agreement

¶ 3.  Notwithstanding the Hubers' arguments to the contrary, the Court finds that those

provisions of the Standstill Agreement establish the Hubers' consent to this Court's jurisdiction.

The Hubers attempt to avoid that conclusion on the grounds that, because the forum

selection clause applies to "any dispute under this Agreement," it is irrelevant in this action,

which is not a dispute "about the Standstill Agreement itself."  Resp'ts' Mem. MD 18.  That

argument runs directly against this Circuit's precedent that "the scope of a forum selection clause

11

is not limited solely to claims for breach of the contract that contains it." *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008) (citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993)); *accord. Mercer v. Raildreams, Inc.*, 702 F. Supp. 2d 176, 180 (E.D.N.Y. 2010) ("[I]t is settled law in this Circuit that forum selection clauses are to be interpreted broadly and are not restricted to pure breaches of the contracts containing the clauses.").

When determining whether a forum selection clause reaches a certain action, courts rely "principally on how broadly the clause[] [is] worded," *Cfirstclass Corp.*, 560 F. Supp. 2d at 329, and whether its application would be "unreasonable and unjust," *D.H. Blair*, 462 F.3d at 103; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985) (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). Here, the Court is satisfied that the phrase "any dispute under this Agreement" is sufficiently broad to indicate consent in this action. Had the parties sought to restrict the forum selection clause to claims brought on the Standstill Agreement, *e.g.*, for breach of contract, they could have limited it as such. Instead, they relied on the broad term "any dispute," which indicates breadth beyond the narrow confines of actions brought on the contract itself. *See Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 947–49 (S.D.N.Y. 1994) (collecting cases and applying a forum selection clause made applicable to "any dispute arising hereunder" to Lanham Act claims).

Moreover, given that the agreement was subject to termination by either party, the Hubers' construction of the clause would render it meaningful in only the narrowest of circumstances, cutting against the "strong public policy in favor of enforcing forum selection . . . clauses." *Roby*, 996 F.2d at 1361; *accord. Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 288–89 (S.D.N.Y. 2018); *Kasper Global Collection & Brokers, Inc. v. Global*

*Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 566 (S.D.N.Y. 2013).  Read in light of

that policy and the broad interpretation afforded forum selection clauses in this Circuit, *e.g.*,

*Cfirstclass Corp.*, 560 F. Supp. 2d at 329, the contractual language evidences an intent to submit

to the jurisdiction of this Court in disputes involving the enforcement or interpretation of the

Standstill Agreement, including arbitral enforcement actions like the one at bar.[4]  The Court will

hold the parties to that decision absent any suggestion that it would be unreasonable or unjust to

do so.  *See D.H. Blair*, 462 F.3d at 103.

No such suggestion can be maintained here.  The Standstill Agreement was created

wholly within the context of the arbitral award for the purpose of managing the parties' rights

thereunder—most notably, EGI's ability to enforce the arbitral award against the Hubers

notwithstanding any delay in their doing so.  *See* Resp'ts' Mem. MD 9 (noting that the Standstill

Agreement was entered into as a result of EGI's initial suggestion that it might attempt to enforce

the Award against the Hubers).  Once that agreement was in place, the validity of the arbitral

award claims "ultimately depend[ed] on the existence of [the] contractual relationship between

the parties," and the resolution of those claims would "necessarily require analysis of the parties'

rights and duties under the agreement[]" and "interpretation of the contract."  *Cfirstclass Corp.*,

560 F. Supp. 2d at 329–30 (quoting *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 Civ.

10550 (SHS), 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000)).

---

[4] Such intent is further demonstrated by the Hubers' consent to service of process in New York, both by mail and electronically, "in connection with the Chilean arbitration proceedings and any other actions."  Standstill Agreement ¶ 3.  It is well settled that physical service of process establishes personal jurisdiction in the forum where service was effected.  *E.g.*, *Burnham v. Superior Court of California, County of Marin*, 495 U.S. 604 (1990).  The parties have not addressed, and this Court need not determine, whether the mere consent to service in a specific forum, or the actual receipt of electronic service by a resident of that forum, may individually or in concert establish personal jurisdiction.  It is sufficient to note that, in conjunction with the forum selection clause analysis above, the consent to service clause and the actual receipt of electronic service by Richard Huber, a New York resident, on behalf of all of the respondents, further demonstrate that the Hubers contemplated litigating this issue here and consented to personal jurisdiction for that purpose.

The nature of the Hubers' defense demonstrates as much: whether or not EGI's right to enforce the arbitral award has expired depends entirely upon the effectiveness of the Standstill Agreement's tolling clause, and thus upon the parties' rights and obligations under the Standstill Agreement. That being the case, it is entirely reasonable to enforce the forum selection clause against the Hubers here. *Id.* at 330; *See also Banca di Credito Cooperativo di Civitanova Marche e Montecosaro Soc. Cooperativa v. Small ex rel. Mengoni*, No. 18 Civ. 11399 (JPO), 2019 WL 6915729, at *5 (S.D.N.Y. December 19, 2019).[5]

The Hubers further argue that because the Standstill Agreement is unenforceable, it cannot provide the jurisdictional basis outlined above. Although the Court ultimately agrees that the Standstill Agreement is unenforceable under New York law, *see* discussion *infra* Section III.B, that determination has no bearing on the threshold question of personal jurisdiction. As explained above, consent through contractual provisions is a longstanding means of satisfying the Due Process right implicated by personal jurisdiction. *E.g.*, *D.H. Blair*, 462 F.3d at 103.[6] Yet, to adopt the Hubers' position would be to effectively nullify that form of consent in all situations where the underlying contract is held unenforceable in the course of the proceeding. The Hubers cite no authority indicating that contractual consent to personal jurisdiction should be limited in this manner, and the court does not find any reason to do so here.

---

[5] The Hubers attempt to distinguish the aforementioned authority by suggesting that the Standstill Agreement, unlike the contracts in those cases, does not "govern the relationship between the parties." Resp'ts' Reply Mem. Supp. Mot. Dismiss 8 n.16, Doc. 24 (hereinafter "Resp'ts' Reply. MD"). Even if that fact were determinative of consent to jurisdiction—a proposition for which the Hubers reference no authority—it is patently clear that the Standstill Agreement contains multiple provisions governing the conduct of and relationship between EGI and the Hubers. *See supra* note 2.

[6] The general test for contractual consent also includes requirements, none of which are in dispute here, that serve to protect the Due Process right at stake. *D.H. Blair*, 462 F.3d at 103 (noting that the "existence of the clause [must have been] reasonably communicated" to the party charged and that it cannot be the product of "fraud or overreaching" (internal citations omitted)).

### 2. New York's Long-Arm Statute

EGI also argues that the Court has specific jurisdiction over the Hubers pursuant to the provision of New York's long-arm statute concerning business transactions.  CPLR § 302(a). Although that provision requires only a single purposeful transaction bearing a substantial relationship to the claim asserted, *e.g.*, *Roxx Allison Ltd. v. Jewelers Inc.*, 385 F. Supp. 3d 377, 380–81 (S.D.N.Y. 2019), the Court doubts that EGI has demonstrated any such transaction with respect to Alex, who had minimal involvement in any dealings that related to New York, or the two Chilean companies, which do not conduct any business in or around New York, if at all. Resp'ts' Reply MD 7–8.  However, because the Court is satisfied that the Hubers have consented to personal jurisdiction, there is no need to make any such determinations conclusively.

**B. Exceptions Under the Panama Convention**

The Hubers further argue that five provisions of Article V of the Panama Convention warrant departure from this Court's otherwise summary treatment of enforcement petitions.  *See Citigroup*, 776 F.3d at 126; *Encyclopaedia Universalis*, 403 F.3d at 90.  As the party opposing enforcement, the Hubers bear the heavy burden of proving that those exceptions apply.  *See Telenor Mobile Comms.*, 584 F.3d at 405.  The Court finds that they have not met that burden.

### 1. Inability to Present a Defense

The Panama Convention provides relief from enforcement for parties "against which the arbitral decision has been made" who were "unable, for any . . . reason, to present [their] defense." Art. 5(1)(b).  Seeking to take advantage of that exception, the Hubers suggest that they "did not participate in the arbitration because they understood and relied on EGI's assurances that they were not the targets of the arbitration and instead actively assisted EGI before and during that proceeding."  Resp'ts' Mem. MD 21.  Had they understood that EGI would seek to enforce the

15

award against them, the Hubers claim, they would have "vigorously defended themselves" during the arbitration on a number of grounds.  *Id.* at 20–21.  That argument is without merit.

The Hubers mistake their decision not to defend themselves during the arbitration proceedings for an inability or lack of opportunity to do so, only the latter of which are covered by the exception.  *See, e.g.*, *BSH Hausgerate GmbH v. Kahmi*, 291 F. Supp. 3d 437, 441–42 (S.D.N.Y. 2018) (noting that the inquiry is designed to "ensur[e] that there was 'the *opportunity* to be heard at a meaningful time and in a meaningful manner'" (emphasis added) (quoting *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992)).  Because the Hubers cannot establish that they lacked any such opportunity, or that the procedure used during arbitration "was fundamentally unfair," *id.*, they cannot rely on article 5(1)(b) for relief.

### *2. Scope of Award & Procedural Failure*

The Panama Convention also provides relief when "the decision concerns a dispute not envisaged in the agreement between the parties to submit to arbitration" and those issues cannot be separated from those that were so envisaged, art. 5(1)(c), and when "the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties," art. 5(1)(d).  The Hubers argue that both of those exceptions apply because, "at the time the dispute was submitted to arbitration and at the time of the alleged breaches of the Shareholders' Agreement, [Richard and Alex] were no longer shareholders of VSR and were no longer parties to the Shareholders' Agreement."  Resp'ts' Mem. MD 22.  That argument fails as a matter of fact.

In the first place, Richard and Alex are included in the Agreement's definition of "Controlling Shareholders," which is not dependent upon the number of shares owned by the party, and both are signatories to that agreement.  *See supra* note 1.  And, at any rate, the Hubers

16

cannot dispute that Alex, Richard, and their companies entered appearances in the arbitration proceeding and agreed, "by means of a notarized document dated November 27, 2009, . . . that all disputes, difficulties, and controversies arising from the application, interpretation, duration, validity, or execution of the Shareholders' Agreement" would be resolved through arbitration. Award 1–2.[7]

Surely the Hubers were aware, given EGI's letters and their agreement to arbitrate thereafter, that the Put Right would be of issue in the arbitration.  If the Hubers had concerns about their inclusion in that proceeding, or their liability under the Put Right in light of their transfer of shares, they could have raised those issues before the arbitrator when the opportunity presented itself.  *Sokolowski v. Metropo. Transp. Auth.*, 723 F.3d 187, 191 (2d Cir. 2013) (noting that parties who "participate[] in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration" may have waived the right to object to that issue after the fact (quoting *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003)).  At this stage, however, the Hubers present no compelling basis for treating them as non-signatories to an arbitration agreement that they have, in fact, signed, and their attempts to rely on their holding companies to avoid their obligations under that arbitration agreement are unavailing.

### 3. Non-binding Decision

The Hubers turn next to the exception for claims where "the decision is not yet binding on the parties or has been annulled or suspended by a competent authority of the State in which, or according to the law of which, the decision was made."  Panama Convention art. 5(1)(e).

---

[7] Notably, the Award does not mandate any action on the part of "shareholders," but instead on the part of "respondents," *i.e.*, the parties that, like the Hubers, agreed to submit to arbitration to resolve the aforementioned issues.  Award 100–102.

Their argument under that provision turns on their construction of the arbitral award as an order "to do" not "to pay," which they claim renders EGI's petition for a set value of monetary liability a claim for relief to which EGI is not entitled and the Hubers are not bound. That argument, like those above, is detached from the facts before the Court. While the Award may not provide for the final sum claimed by EGI, it provides the necessary framework for calculating that sum and orders that the "sum . . . be paid with adjustments and current interests earned from the date the put right was exercised . . . ." Award 100–102; Pet. ¶¶ 17–18, appx. A. The Hubers, who carry the burden on this issue, fail to demonstrate how that order does not entitle EGI to a specific monetary reward or why that order is otherwise unenforceable under the relevant exception. Rather, the entirety of the record and the language of the Award suggest that EGI is entitled to a specific monetary sum, and thus converting the Award to judgment for that amount presents no issue in and of itself.[8]

### 4. Public Policy

Lastly, the Hubers rely on the Panama Convention's exception for situations where "the recognition or execution of the decision would be contrary to the public policy of [the State in which it is requested]." Art. 5(2)(b). Their argument with respect to that exception relies on their contention that EGI is impermissibly treating the award as a money *judgment*. Once again, the Hubers mischaracterize the petition at bar. EGI's request is simple: they have asked this Court to take a monetary *award*—as distinct from a final monetary judgment entered by a judicial authority—and to convert it to judgment pursuant to the FAA and the Panama Convention.

---

[8] This Court makes no judgment as to whether the Award is valid under Chilean law, as the Hubers provide no explanation as to why that would warrant relief under the exception concerning non-binding awards. It is telling, however, that despite arguing that the Award is invalid under Chilean law, the Hubers were unsuccessful in their attempt to have the Award annulled by a court in Chile. Vail. Decl. Supp. Petition II, Ex. G ¶ 16, Doc. 21.

Because EGI is not seeking to enforce a prior final and binding monetary judgment, the Hubers'
argument must fail.

### C. Statute of Limitations

Finally, the Hubers argue that the instant petition is time-barred.  Neither party contests
the applicability of the FAA's three-year statute of limitations in this action, 9 U.S.C § 207, and
it is undisputed that EGI filed its petition on June 28, 2019, more than seven years after the
arbitral award was made.  EGI's petition is therefore time-barred absent some relief from the
FAA's standard limitations period for Panama Convention claims.  They maintain that the tolling
provision contained in the Standstill Agreement between them and the Hubers provides such
relief, and so the issue becomes whether that provision effectively tolled the FAA's limitation
period.

Because the Standstill Agreement is, by its terms, "governed by the laws of the State of
New York," ¶ 5, the Hubers point to two specific New York laws that purportedly invalidate the
Agreement's tolling provision.  First, they rely on New York General Obligations Law § 17-103,
which governs private agreements to toll certain limitation periods, to argue that the Standstill
Agreement violates New York law by tolling the FAA's statute of limitations indefinitely.
Second, they rely on New York CPLR § 202, often called a 'borrowing provision,' to argue that
the Court must look to Chile's law on private tolling, which also invalidates the Standstill
Agreement.  The Court assesses the applicability and effect of each.[9]

---

[9] The Hubers raise a third time-based defense to the petition; namely that laches prevents enforcement as a matter of
fundamental fairness.  Resp'ts' Mem. MD 16–17.  The Court is satisfied that the fairness and potential prejudice of
enforcing the Award is adequately considered in this Court's analysis of the other issues and that there is no
colorable laches defense available to the Hubers here.  *See, e.g.*, *Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*,
896 F.3d 174, 193–94 (2d Cir. 2018) (describing the limited applicability of laches).

### *1. New York's Private Tolling Statute*

New York law limits the ability of private parties to toll certain statutes of limitation through agreement:

> A promise to waive, to extend, or not to plead the statute of limitation applicable to an action arising out of a contract express or implied in fact or in law, if made after the accrual of the cause of action . . . is effective according to its terms, to prevent interposition of the defense of the statute of limitation in an action or proceeding commenced within the time that would be applicable if the cause of action had arisen at the date of the promise, or within such a shorter time as may be provided in the promise.

GOL § 17-103(1).  In effect, the statute allows private parties to reset the limitations clock by treating the date of the agreement as the new accrual date against which the limitations period is measured.  However, tolling agreements cannot extend a limitations period in any other manner or for any greater period of time than that provided by the statute.  § 17-103(3).  Consequently, tolling agreements that purport to toll the relevant statute of limitations indefinitely are not enforceable under New York law.  *T&N PLC v. Fred S. James Co.*(*T&N II*), 29 F.3d 57, 61–62 (2d Cir. 1994) (citing *Bayridge Air Rights, Inc. v. Blitman Constr. Corp.*, 80 N.Y.2d 777 (1992)).

EGI argues that the statute does not control in this case given that the provision applies only to "statute[s] of limitation applicable to an *action arising out of a contract . . . .*"  § 17-103(1) (emphasis added).  In EGI's view, that language restricts the application of § 17-103(1) to New York's six-year statute of limitations for breach of contract actions and does not, therefore, limit the effectiveness of the Standstill Agreement.  Pet'r's Mem. MD 11 n.7.  The Court disagrees and holds that because this arbitration was pursued to resolve a dispute concerning an underlying contractual right, § 17-103 applies to and invalidates the Standstill Agreement—which purports to toll indefinitely the relevant statute of limitations under the FAA—rendering EGI's petition time-barred.

The central question for the Court, in reaching that decision, is whether § 17-103(1) is broad enough to encompass this petition to enforce an arbitral award. To answer that question, the Court begins with the statute's text. *See BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). Here, the ordinary meaning of the operative phrase—"arising out of"—focuses the Court's analysis on the source of the underlying dispute, rather than the procedural posture of the action itself. *See Arise*, Black's Law Dictionary (11th ed. 2019) ("To originate; to stem (from)"); *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004) (referring to "originate" as a common meaning of "arise"). *See generally Burton*, 549 U.S. at 91 ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)).[10] Put otherwise, the ordinary meaning of the statute's language encompasses actions that, while not technically contract claims, primarily concern a dispute, right, or obligation that itself originates in or stems from a contractual relationship.

Understood as such, § 17-103(1) clearly applies to this petition: At base, EGI is attempting to vindicate the Put Right provided to them by the explicit terms of the Shareholders' Agreement. Pet. ¶¶ 12–17. Arbitration and the FAA may provide the procedural mechanism for doing so, but they do not alter the contractual nature of the underlying right and dispute that necessitated both the arbitration and this enforcement action.

This reading also comports with the structure of the statute as a whole, which includes a provision explicitly exempting multiple causes of action from the scope of § 17-103(1), none of

---

[10] The legislature's use and disuse of "arise" in analogous contexts lends further support to this reading. *Compare* New York CPLR § 213(2) (McKinney's 2019) (using the phrase "action upon a contractual obligation or liability" to impose a six-year statute of limitations for breach of contract claims), *with id.* § 302(a) (providing personal jurisdiction in causes of action "arising from" specific business transactions, tortious actions, or use or possession of real property within the state), *and D.H. Blair*, 462 F.3d at 105 (noting that "arising out of," as used in § 302(a), requires only a "substantial nexus" between the claim and the action out of which it is said to arise).

which constitute breach of contract claims.  § 17-103(4)(c).  Adopting EGI's construction of § 17-103(1) would impermissibly render that provision a redundant exclusion of actions already without the scope of the statute.  *See, e.g.*, *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 174–79 (2012) (suggesting that statutory language should be interpreted so as to avoid rendering any provision superfluous)).

This Court's interpretation is also fully consistent with the way in which courts have applied § 17-103.  Most notably, courts in this district and New York state courts have applied the statute outside of the breach of contract context.  *See Sullivan v. Brodsky*, No. 7 Civ. 0003 (BSJ), 2009 WL 2516838, at *3 (S.D.N.Y. Aug. 17, 2009) (stating that § 17-103 governed an agreement purporting to toll the one-year statute of limitations applicable to a defamation claim), *aff'd*, 380 F. App'x 21 (2d Cir. 2010); *In re Cohoes Indus. Terminal, Inc.*, 78 B.R. 681, 703–704 (Bankr. S.D.N.Y. 1987) (finding agreement extending time limitations applicable to claim for additional contingent rent authorized under § 17-103(1)); *Lifset v. Western Pile Co.*, 85 A.D.2d 855, 856 (N.Y. App. Div. 3d Dep't 1981) (applying § 17-103(1) to an agreement to toll the statute of limitations applicable to actions for fraud).  Moreover, courts that have opined on the scope of the statute have done so in a manner that is in line with this Court's construction of the statutory language.  The Appellate Division's analysis in *In re Santec Consulting Group*, though not dealing with an enforcement petition, is instructive.  36 A.D.3d 1051 (N.Y. App. Div. 3d Dep't 2007), *leave to appeal denied*, 9 N.Y.3d 807 (2007).

*Santec* concerned a dispute between an architect and a school district over what the district claimed to be defects in elementary school buildings on which the architect had worked. *Id.*  As the parties attempted to determine the cause of the defects, they entered into an agreement

that tolled the limitations period for seeking arbitration of relevant claims until either party terminated the agreement. *Id*. at 1052. After properly terminating the agreement, the school sought arbitration, and the architect subsequently sought a permanent stay of arbitration on the grounds that the tolling agreement was impermissibly indefinite and the demand for arbitration thus time barred, raising the question of whether § 17-103 applied to the private tolling agreement. *Id*.

The court, in its analysis, focused on the "gravamen" of the school's claim—*i.e.*, the substantive nature of the relief sought—rather than on the fact that the arbitration demand technically stated a claim for breach of contract. *Id*. at 1052–53. In doing so, they determined that the arbitration demand, in substance, "[sought] relief for [the architect's] professional malpractice." *Id*. at 1052. Because a professional's duty of care to their client is "extraneous to a contract" under New York law, the "gravamen" of the school's claim arose "not out of the contract but, rather, out of [the architect's] duty of care by reason of" their professional relationship. *Id*. at 1052–53. Consequently, § 17-103(1) was inapplicable. *Id*. at 1053.[11]

The arbitral award that EGI seeks to enforce here purely concerns the contractual Put Right. Notwithstanding the procedural mechanism employed, then, the "gravamen" of EGI's claim is an underlying contractual right, out of which this action arises. *Santec*, 36 A.D.3d at 1052–53*; cf. T&N I*, 1993 WL 17336, at *4. Under that rationale, as under this Court's interpretation of the statute, the Standstill Agreement is subject to the limitations of § 17-103(1), and the Court has no difficulty finding that its tolling provision is unenforceable thereunder.

---

[11] This Court has previously employed similar reasoning in determining the applicability of both certain statutes of limitations and also § 17-103(1). *T&N PLC v. Fred S. James & Co.* (*T&N I*), No. 89 Civ. 7688 (CSH), 1993 WL 17336, at *4 (S.D.N.Y. Jan. 21, 1993) (invalidating tolling agreement and dismissing hybrid contract and tort claim as time barred where complaint "had its *genesis* in the contractual relationship between the parties" (emphasis added)), *aff'd T&N II*, 29 F.3d 57.

The Standstill Agreement explicitly tolls "the statute of limitations and other laws, rules or treaties that might in any jurisdiction time bar or extinguish any EGI [claims concerning VSR], or the enforcement [thereof] or the ability to recover [thereunder]" and bars the Hubers from raising all statute of limitations-based defenses "from the date of this Agreement until the expiration of this Agreement."  Both New York state courts and the Second Circuit have clarified that "effective, according to its terms," as used in § 17-103(1), means that the agreement must meet the statute's requirements on its face.  *E.g.*, *T&N II*, 29 F.3d at 61–62 (citing *Bayridge Air Rights, Inc.*, 80 N.Y.2d 777).  Because the Standstill Agreement does not explicitly limit the effect of its tolling to a statutorily permissible period and instead purports to toll the statute of limitations indefinitely, the Standstill Agreement is invalid under New York law.  *Id.*[12]

### 2. New York's Borrowing Provision & Chilean Law

New York law also includes a borrowing provision, which provides that, absent limited circumstances, "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued."  CPLR § 202.  Under that statute, a foreign jurisdiction's statute of limitations is considered to include any relevant tolling provisions. *Grynberg v. Giffen*, 119 A.D.3d 526, 527 (N.Y. App. Div. 2d Dep't 2014) (citing *GML, Inc. v. Cinque & Cinque, P.C.*, 9 N.Y.3d 949, 951 (2007)); *Childs v. Brandon,* 60 N.Y.2d 927, 929 (1983).  The Hubers attempt to invoke the borrowing provision here to argue that the Chilean

---

[12] EGI also attempts to avail itself of this Court's authority to equitably toll statutes of limitation by referencing other courts that have equitably tolled 9 U.S.C. § 207's time limitations.  Pet'r's Mem. MD 12.  In the cases to which they cite, however, it is made clear that EGI would need to affirmatively show "that some extraordinary circumstances stood in [their] way and prevented timely filing."  *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 245 (D.D.C. 2015); *accord Everplay Installation Inc. v. Guindon*, No. 8 Civ. 00824 (PAB) (CBS), 2009 WL 4693884, at *5 (D. Colo. Dec. 2, 2009) (requiring that the party seeking tolling show a link between delay in filing and misconduct of adversary).  EGI has not attempted to make any such showing, and thus even if equitable tolling of the three-year limitations period is permissible in general, the Court is not convinced that it is warranted here.

statute of limitations concerning arbitral enforcement, as well as Chile's general bar on private tolling agreements, apply to the petition and render it time-barred. Resp'ts' Mem. MD 13–14. That argument rests, however, on the mistaken premise that if § 202 is encompassed by the Standstill Agreement's choice of law clause, it is applicable to this action.

Regardless of whether the Standstill Agreement's contractual language is, in fact, broad enough to reach § 202, the borrowing provision does not, on its terms, apply to this action. Unlike § 17-103, which applies explicitly to and governs the validity of certain private *agreements*, the borrowing provision applies only to certain legal *actions* for a specific procedural purpose. Thus, while § 17-103 applies directly to the Standstill Agreement in order to determine the validity of the tolling provision and its effect on the timeliness of the petition, the borrowing provision has no bearing on that issue unless the underlying action is itself within the scope of that statute. *Compare* GOL § 17-103(1) (limiting the effectiveness of "[a] promise to waive, to extend, or not to plead [certain] statute[s] of limitation[] . . . ."), *with* CPLR § 202 (providing a mechanism for courts to determine the laws governing the timeliness of "action[s] based upon a cause of action accruing without the state . . . ."). The instant action does not fit that bill.

EGI brought this petition pursuant to a federal cause of action that is subject to a congressionally mandated limitations period of three years. 9 U.S.C. §§ 207, 302; *See Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152, 158 (2d Cir. 2003) (confirming that § 207 creates a statute of limitations). Consequently, GOL § 202 is inapplicable, as neither the time limitations of New York nor those of the relevant foreign jurisdiction control over the federal limitations period. *See Good Challenger Navagante S.A. v. Metalexportimport S.A.*, No. 6 Civ. 1847 (KMK), 2006 WL 7122409, at *1–2 (S.D.N.Y. July 24, 2006) (applying § 202 to an

action concerning a foreign arbitral award only after determining that "the time limitations . . . would not be governed by § 207, and instead, would be governed by New York's statute of limitations").  The Hubers' borrowing provision argument might carry some weight if the arbitration agreement itself stipulated that New York law would control the enforcement of arbitration, *see In re Smith Barney, Harris Upham & Co., Inc. v. Luckie*, 85 N.Y.2d 193 (1995), or if this were an action for breach of the Standstill Agreement, *see 2138747 Ontario, Inc. v. Samsung C & T Corp.*, 31 N.Y.3d 372 (2018).  In an action for enforcement under the Convention such as this one, however, § 202 is inapplicable.  While the Agreement remains invalid under § 17-103, the borrowing provision does not create an *additional* bar to its enforceability.

## IV.   CONCLUSION

For the reasons set forth above, the Hubers' motion is GRANTED and EGI's petition to enforce the Award is DISMISSED as time-barred.  EGI's motion to strike is DENIED as moot. The Clerk of the Court is respectfully directed to terminate the petition, Doc. 1, and close the case.

It is SO ORDERED.

Dated:   March 27, 2020 New
         York, New York

_____
Edgardo Ramos, U.S.D.J.